This case number 418-0387, McWethy v. Mast, and we have the appellant present by Mr. Lee and the appellee, Mr. Kosick. Yes, sir. Is that how you pronounce it? Kosick. Okay, thank you. Counsel, thank you for being here early as we request. Since you're here, we're going to go ahead and get started early. You may proceed, Mr. Lee. Okay, please, the court. Mr. Kosick, your honors, this is a case, I think, that is somewhat of a unique case in the sense that I believe the record shows that this property involved in question was subdivided early on in the history of the city of Tuscola on three different occasions. The surveyors, I think, agreed that there were almost definitely problems with the particular property from the outset. The appellee surveyor indicated that problems persisted and hadn't been fixed even after efforts had been made over the years to do that. Also, it presents a somewhat unique situation, I think, in the sense that the two properties involved here were under common ownership for many, many years and not divided, which is somewhat unusual, I think, in a small town in a residential area where the two residences would be under common ownership for so many years without being sold off at some point to a different third party. Even though the properties were split in the sense that two residences were built and two different members of the family were living there, there was never any surveys performed up until the time that led to this litigation when my client, the appellant, had the property surveyed in order to demolish an old garage and construct a new garage. That led to a boundary survey which showed that there was a deficiency in the property that no one had been aware of because of the circumstances. I think that appellee surveyors, while he approached it, I think, from a different perspective and with a different purpose in mind, the evidence and the testimony didn't disagree that deficiencies existed. There were problems that had to be fixed in his situation by making everything fit to the existing property lines that were on the ground when he performed his survey. I note that the appellant surveyor, Mr. Parsley, was employed for the purpose of doing a boundary survey. He put pins on the property to note the boundary markers, the boundary corners. Survey performed by the appellee surveyor didn't result in him pinning any of the corners of the property upon completing the survey. That's why I say to the court that I think the purposes of the surveys were not the same. They were different. The survey we had performed was a boundary survey to locate the boundaries. The survey that was done by the appellee surveyor was done after litigation started. It really was for, I think, the purpose of making things work out for Mr. Kosick's client in terms of making everything come out the way that they were looking to have it come out. Mr. Lee? Yes. Could you speak to the pleadings and what was at issue at the time of the bench trial, just simply to know what it was that was to be decided by the trial court here at trial? Sure, Your Honor. I'll be happy to try to do that. There were quite a few pleadings filed initially, and that's been some time ago. I believe that when we filed initially, we filed a complaint for, actually a two-count complaint. It was for quiet title and for ejectment. And just to be clear, I'm just asking what was viable at the time of the bench trial? In other words, what did the trial court have to decide? Well, I think the quiet title action was viable at the time of the bench trial. And both sides had actions to quiet title? That's correct. Okay. There were cross complaints for quiet title. I believe the ejectment count was still viable at the time of trial. Well, I know Judge, I think, well, I can't remember the timing. Judge Weber decided the adverse possession, there was an adverse possession claim by Applee, which Judge Weber decided, I want to say, probably after the Applee's evidence was presented. I think it was decided on a motion for a directed verdict that there wasn't sufficient evidence to show adverse possession. That issue was decided prior to the end of the trial. There was also a separate action, which I don't think is a part of this appeal, that had been filed by Applee, which was for forcible entry and detainer. And I'm trying to recall, I don't recall exactly when that issue was decided. I don't remember if that was decided prior to the end of the bench trial or if it was still viable at the end of the bench trial. But I think our argument as to that issue always was that it was really not a possession issue, per se. It was a title issue, a question of who owned what piece of property. And I think we'd argued that to the trial court several times, but I don't now recall exactly when the trial court decided that question about the forcible entry and detainer. But I believe at some point Judge Weber decided that that was not really a viable complaint. And as I remember, it really boiled down to the quiet title question. There was a competing claims for quiet title, and I think that's really what the judge was deciding at the end. And in terms of an adverse possession claim, it was only a plaintiff that asserted an adverse possession claim? Is that right? Yes, I believe that's correct. Yes. How long had your client's garage been in the location it is? Which garage are you referring to, Your Honor? The older garage that was torn down or the new garage? Well, the walls, is the west wall of the current garage in the same location as the old garage? Well, our contention, and I think the evidence we presented was because of the dispute concerning the property, when the new garage was constructed, my client took efforts or took steps to move that wall farther east so there would not be a question about whether it was in the disputed area or not. Now, I know the appellee presented evidence that that was not the case, that it ended up being moved farther west, but my client's contention always was that they took pains to move the whole structure, I believe, a foot or so to the east so that there would not be a question of the wall being in the disputed area. Just in terms of potential claim for adverse possession by your clients, that has not been litigated in this case. No, it hasn't. Is there still the potential for that legally? Well, I suppose, Your Honor, that under the law, maybe that potential exists because of the fact that my clients could tack their claim to the earlier title holder. But, I mean, they did not own the property for 20 years. As was the case of the appellee, the appellee did not own the property for 20 years. All right. Thank you. As I say, I think the evidence was pretty clear that a deficiency existed in this block of property and that there have been problems for a number of years, perhaps from the inception. That being the case, I think the law here in Illinois is relatively clear that when there is this type of problem, that the apportionment rule would apply and that that deficiency would have to be borne by all of the property owners within the block that's involved and that that would have to be on a proportionate basis. We pointed that out to the trial court in the argument that we presented at the end of the bench trial. The judge obviously didn't agree with us, ruled differently, fixed the property line at the west wall of my client's new garage, which we believe, Your Honors, only has the potential to create future issues and future problems for the parties who obviously have been in a fairly contentious state here because of the litigation. So we believe that the correct decision here is for the apportionment rule to apply and we would ask that the case be remanded back to the trial court so that those proceedings could be held. I had a question. Sure. Mr. Parsley based his legal description and his measurements based on what was called in the briefs and everything, the east section line. Okay. And then Mr. Cox worked from, I guess, the west section line. He did. That's correct. I don't know if he worked from the west section line. He worked from the west of the block where this property was located. Right. So explain to me, if you can, the difference. Okay. I mean, I understand. Well, I think I pointed this out in my brief, Your Honor, that logically, when you think about it, there shouldn't be a difference. I mean, if the property is there, it wouldn't matter whether you measured from the east or the west. Surveyors, and I think in this case, and Mr. Parsley testified at trial, he had worked from the east side of the property. There is a section corner that's probably a quarter of a mile, I'm guessing, from where the east corner of this block is. He had worked from that section corner eastward, which apparently, and I think he testified to this, he had done in the past when he had performed surveys in that part of Tuscola, which he had done in the past. And, in fact, I think he testified that there were known markers that he knew of measuring from the east, which he had identified in the past and he used in the past and he used on this survey. I believe, in fact, that Mr. Cotts even testified that he had contacted Mr. Parsley, because he'd done this survey earlier, and asked him about what he had done, and he had provided him information about known markers that he had used and other information that he had used in the past and on this survey for Mr. Cotts to review. I don't know, Your Honor, why Mr. Cotts chose to come from the west rather than the east. As I say, if the property is there, it shouldn't have made any difference. It would all come out the same. There would be enough property there, but it didn't. So we're not talking about necessarily a difference in the starting point? I mean, when you say the east section line, where are you when you start the measurement? Well, normally, I think Mr. Parsley started at the section corner, which lies, as I said, about a quarter of a mile east of where the northeast corner of this block would be. It's about a quarter of a mile east of there. There's four sections that come together there. He started there. If you were going to go west of this block to a section corner, I believe that you would have to go even farther away. Now, I don't know that Mr. Cotts went that far. I believe, if I remember his testimony correctly, he said that he went over, there is a main street that lies a couple of city blocks west of this block, Nile Street. And I believe, if I remember the testimony correctly, Mr. Cotts said he began with a marker at Nile Street. I don't know that that's a section corner, but he started there, I believe, and then measured west. Now, why he chose to start there, I can't say for certain. Normally, I would think, or normally in my experience, having worked with surveyors over the years, usually they will try to start at a section corner or a half section marker or a quarter section marker when they can at the beginning of the survey. And I don't know if that's what Mr. Parsley, or I'm sorry, if that's what Mr. Cotts did in this case or not. I'm not sure where he started exactly. So what is a section corner? A section corner marks where a particular section of land or one corner of that section starts. In this case, the property that would be, that this block was included in, which is south of North Vine Street in Tuscola, that is in Section 34. Most of the city of Tuscola lies in Section 34. Tuscola is a railroad town. The railroad owned that property years and years ago. This is the Illinois Central Railroad, and that property was given to the railroad, and then subsequently the railroad, I don't know if they gave it, it came to the city of Tuscola to build the city as the railroad did back in those days along the rail line so that there were places for them to stop and places to serve and that sort of thing. Tuscola was one of those towns, and Section 34 was the section that was originally laid out for the city of Tuscola. Immediately north of that is Section 27. So if you go east of this property about a quarter of a mile, there are, I believe, four section corners there where the four sections come together. Section 27, Section 34, and then there's two sections on east there that all come together at the corner of two streets there in Tuscola, essentially. And that's where Mr. Parsley began. He began at what would be the northeast corner of Section 34 and then measured over to this property and then did his measurements. And I would say from my experience, I'm not a surveyor, but from my experience working with surveyors, that's not at all unusual. That's oftentimes what they would do. They would go to what would be a pretty well-defined marker that's existed for many years and start there and then do their survey. And that's what Mr. Parsley did in this case. He started at the section corner and measured west. As I say, Mr. Cox started west of the property and measured east, and I'm not certain exactly where he started, but I don't think it was a section corner because the next section corner west, I believe, is quite a ways over. Thank you. You're welcome. I hope that helps. It did. Counsel, this case, the appeal depends on whether or not a deficiency was established at trial, right? Certainly. You indicate in your brief that Mr. Parsley put the deficiency at 10 to 12 feet, and that's the east-to-west measurement, right? Yes, it would be an east-to-west measurement, yes. And then you wrote that Mr. Cox estimated it to be between 8 1⁄2 to 10 feet. I believe that was what his testimony was at trial. But Appalee says there was no deficiency established here. So did Mr. Cox, I guess, is there any dispute as to whether or not Mr. Cox testified that a deficiency existed in the east-to-west measurement? I guess I don't know for sure if Appalee disputes that. I presume that they do, but I believe I made reference to the record. I think when I pointed that out in my brief, I think there was a point in the testimony where Mr. Cox said. It would seem like a very clear-cut thing. Either he did testify to it or he didn't testify to it. There were only two experts, Mr. Parsley and Mr. Cox. So I can ask Mr. Kosick when he addresses the issue. Thank you. So I have a question with regard to the court clearly made credibility findings, and in doing so the court heard the testimony of both the surveyors. What do we make of the fact that there's a suggestion that the party's usage of the property prior to the dispute seems to match the survey of Cox? The use of the property, the locations of, I guess, buildings. Well, all I can say is, Your Honor, that my client's belief was that the garage set a setback six, eight feet, at least, on their property, the existing garage. They tore it down. I think I don't remember if I pointed this out at trial. There was reference made to a fence post and a fence, and I think there's photographs in the record. The fence ran east and west between two garages. It was a small piece of chain-link fence that ran between two garages. There was not, in this case, Your Honor, what I would consider to be a boundary-type fence between the properties. There was no property. There was no fence that ran north and south that would suggest that it delineated the property line between these two properties. And I think, Your Honor, the reason for that was the fact that the Ziegler family had owned this property so many years, and there was two family members that owned these two properties. And so I'm sure, in their case, they weren't looking to try to keep one family member or the other off of their property, so they didn't put up a north-south fence. So, I mean, I think Mr. Cox said that he found this fence post and believed that that was a marker, a boundary marker, but I don't think that he ever pointed to anything else to suggest that that was true. And so, since you had property there that wasn't really delineated, that was part of the reason that I think the building inspector at the city and my clients wanted to get a boundary survey, because there was not a clear delineation of where the boundary line was at, because there was no fence. There had not been a prior survey done where there was survey pins at the corners of the properties. There was nothing of that type there at the time that Mr. Parsley's survey was done. So I think that that's the reason, and I think, frankly, Your Honor, that probably the parties were surprised by what came out of this, because nobody expected that, but, you know, given the circumstances, that's what occurred. If Your Honors don't have any more questions, I don't think I have anything else at this point. Thank you. I don't see any at this time. You will have additional time on rebuttal if you desire. Thank you. Mr. Kosey? May it please the Court, Counsel? This matter is framed by the appellant as a boundary line dispute, essentially involving two parties with competing surveys. Each party, as the appellant argues, should be given equal weight, and as such, a shortage of the block exists, which leads to the necessary application of the apportionment rule. However, the appellee's contention, which is supported by the record of evidence, is that there is not, in fact, a shortage of feet of any distance in the block. So because there is no shortage, evidenced by Mr. Cox's survey and evidence page 18, the apportionment rule would not be appropriate here. It would not apply. So you dispute what appellant has written in his brief, that Mr. Cox estimated the shortage to be somewhere between eight and a half and ten feet? I don't dispute, Your Honor, that Mr. Parsley's survey indicates that that would be the case. But the statement in the brief is that Mr. Cox estimated a shortage to exist between eight and a half and ten feet. Are you saying that that testimony was in relation to Mr. Parsley's survey? The context of the testimony, Your Honor, and I believe you're referring to on Sup. R 96 through 97, indicates... No, I'm sorry. This is R 89 to 90. That's the citation given in the brief. Yes, Your Honor, I'm sorry. That testimony, as I recall, would be with regard to Mr. Cox looking at if giving equal weight to each survey, yes, there would be a contested area of approximately eight feet. So in a world where each survey should be given equal weight, yes, there is a contested area. But as Mr. Cox testified, and I have that down as Sup. R 98 and Sup. R 96 through 97, that there are other avenues that should be looked at when looking at what an appropriate starting point is for a survey. In this case, all the blocks west of the street, which would be Carrico Street, use the west section line starting point legal description. So there is testimony by Mr. Cox that there was no deficiency. That's correct, Your Honor, or if deficiency, it was so negligible that it couldn't be found. And that is supported by the already existing apparent boundary line markers that Mr. Cox found. Now, he testified that was on Sup. R 98, that from experience, those already existing boundary line markers appeared to be consistent with those of surveyors. Which currently, in current practice, what a surveyor would do is he puts his license mark on the boundary line marker. They have a number, such as Mr. Parsley's, if I recall, I couldn't say it correctly, is I believe 2054, and that way you could detect exactly whose survey marker it is. In years past, didn't exactly do that, so you couldn't tell exactly who put those boundary line markers there. But Mr. Cox testified that the ones that he found were consistent with boundary line markers, and they matched up with the West section line legal descriptions. He found already existing ones, and I indicated in my brief, and I apologize if this caused any confusion, on page 2 of my brief, I indicated that he found an already existing boundary line marker at the northwest corner of Lot 2. It was actually the east 15 feet of Lot 3. That would be the westernmost line of the appellee's legal description there. So that fully supported the northwest corner of the west section line legal description of my client's legal description. Additionally, what backed that up, he didn't just find that one supporting boundary line marker, or surveyor's marker. What he also found was in Block 3, which is the block that would be to the southwest of Block 1 that we're dealing with here, he found on the west corner, the northwest corner of Block 3, an already existing found iron bolt, which is consistent with a survey marker. He additionally found in Block 4, on both the northeast corner and the northwest corner, boundary line markers, or surveyor markers, which are consistent with the measurements that Mr. Cox found for the west section line analysis. And that's particularly important, the survey marker that was found at the northeast corner of Block 4, because in there it shows that there is a marker existing right there. Now it's critical because, as Mr. Lee testifies through the evidence, that there's a shortage that exists. Now that northeast corner marker for Block 4, if there was in fact a shortage that exists, that would mean that the legal description that Mr. Cox is advocating for would put the appellant's property in the street. Now that cannot be the case, as shown by the northeast corner of Block 4, because there is a marker there. So if there is a marker there, which lines up exactly with the east line of Block 1, that would mean that that marker would have to be in the street. And there is not a marker in the street. What about the possibility that the marker was improperly placed? Well, Your Honor, as Mr. Cox testified, he found that to be consistent with the legal descriptions, that it totally supported the breakdown in much more detail of Block 1, and the measurements supported in Block 4 where that location would be. And the measurements also coincide with the plat that we're dealing with here, the plat of 1888, as described in the record, which indicates the measurements of approximately 85 feet for that Lot 1, and then approximately 100 foot measurements for the other lots in there. And that lines up near exactly with what we're dealing with here. So that would mean that what the appellant has is the property after Mr. Parsley's survey, moves her property over from what everyone previously saw as being the defined boundary lines, with a defined fence which would be on the west side of her property, moved over by Mr. Parsley's survey further over to the west. Now if you look in a world where the property should be further over to the west, then that would necessarily put the street to the east of the property. Judge Weber's judgment order states, this is paragraph 6 of the findings, he found plaintiff's fee simple ownership extends to the west wall of a garage constructed by defendants. Is that consistent with Mr. Cox's survey east property line for your clients? What Mr. Cox testified to, Your Honor, is my recollection of that, is that the previous old garage of the appellants lined up near exactly, as he could tell, with the west section line legal analysis. When the new garage was put in, it moved over somewhere between a few inches to approximately a foot. Couldn't tell exactly the difference between the old one and the new one, was because by the time Mr. Cox was brought in, they had already poured a foundation for the new garage. But this finding is to the west wall of the then existing garage at the time of the bench trial, right? The judgment, Your Honor, would be with respect to the west wall of the new garage. Yes. So is that boundary line then, your client's east boundary line, consistent with Mr. Cox's survey? And yes, Your Honor, it would be. And to the point where from a total purity standpoint, it is possible that the new garage is over several inches from what Mr. Cox's survey would say. But Ms. McWethy, the appellee, would not be challenging that, essentially, for those few inches of the neighbor's garage. It couldn't be conclusively proved that the new garage was over significantly from the prior garage. So at that point, and because of that, there's no essential challenge that the new garage is infringing on those couple of inches. Essentially, previous to the new garage, the old garage had a fence of Ms. McWethy, the appellee, right up to the west wall there. That's how things stood before. And that's how our clients had understood the property to be before this all came into effect. It was argued at court that, at the very least, that the appellant should get a number of feet to the west of that garage for the purpose of maintaining it. That was not the case previous to each party coming into title. Now, each party did not come into title prior to 20 years. So for that reason, the adverse possession couldn't be proved on those grounds. The last statement again, what'd you say? Each party did not come into possession of their titles 20 years before this came in before the court. So for that instance, there couldn't be purely the 20-year adverse possession timeframe imposed here. So where do the parties stand now in terms of that west wall of the garage? Appellants can't step foot on the west side of their garage without being on your client's property. Is that right? Essentially, yes, Your Honor. And that's the way it had stood beforehand. And unfortunately, that's how the property had been built. And that coincides with the legal descriptions as shown by Mr. Cox. In an ideal world, there would be sufficient setbacks everywhere. But in this case, there are not setbacks. And this isn't something new. It's something that was already existing, being right up to the property line. Did the evidence establish that there were any kind of setback provisions in the village or city of Tuscola? And yes, there were, Your Honor. And unfortunately, what happened here was that an application was made showing the new survey. There was really no research done into it. If there was, it likely would have avoided this whole scenario. But there was not. And here we are dealing with that situation now. But yes, there are setback provisions in the city of Tuscola, but they were not complied with here. So for this, what we fall back to are the legal descriptions. And the preferred legal description should be that of Mr. Cox. And he did testify that in a perfect scenario, a legal description, no matter whether it's measured from a west section line or an east section line, would come to the same legal description. But often, we're not faced with perfect scenarios. And in this case, you have to look to external evidence to support it. And it's not just simply a whim or simple preference because Mr. Cox was hired by the appellee and Mr. Parsley was hired by the appellant. But Mr. Cox specifically looked to the surrounding blocks to see, is there other evidence that supports his analysis? And specifically, those survey markers that were found on the other blocks do support his analysis of that. The only way that the apportionment rule would work here is that, if objectively, there had to be a shortage in the block. And what Mr. Cox's survey shows is that with his measurements through the west section line, there is not a shortage of blocks. Now, it doesn't give the appellee or the appellant that further west property line that the appellant would like from her survey. What it gives her is the original legal description or the boundary lines, as were understood prior to the survey by Mr. Parsley. Again, supported by the survey markers and as shown by his survey, as not being in conflict with the road or anything like that. There was no analysis that this would be going into the road. The only evidence that we have pointing to this is the support, particularly by the survey markers of Mr. Cox, showing it is fully viable to have the block measurements as he shows. And I can't remember from the briefs here, the mention was made of this, but the last deed conveying your client's property and the last deed conveying the appellant's property, did they describe the east to west measurement in terms of feet or simply in relation to total feet? Or was it simply in relation to where they existed in relation to markers? Your Honor, the descriptions, as I recall, were in relation to essentially the lot measurements. It didn't make specific reference to the west section line or the east section line. But did they generally describe the width of the property? Yes, Your Honor. The legal descriptions taken in a vacuum do not conflict. What the issue is where those original lot lines exist. And the application of those lot lines, how the symbolic representation through the language is applied on the ground. And our position is, Your Honor, is that the most correct application, the superior title essentially, is starting from that west section line analysis. What Mr. Lee, and I'm sorry, the appellant would be advocating here, would be an expansive application of the apportionment rule, where there's essentially no issue with a world in which there's a west section line analysis for a number of blocks. No issues with any of the property surveys are all done doing the west section line analysis. And all of a sudden somebody wants to move their property similar to this further west, so they do an east section line analysis. That essentially allows that alternative way of looking at it when there's no other support for it. That allows all this infringing to go on and necessarily advocating adverse possession if you can. Otherwise, lots of quiet title actions and things of that sort. Three cases that Mr. Lee cited in his briefs all had objective facts that there necessarily was a shortage in the blocks. That was incontroverted by the facts in each of those cases. There necessarily was a shortage. So when there is a shortage, that has to be apportioned equally amongst everyone. There was not an analysis that there was actually a shortage here. The analysis and the testimony that there was a shortage was only that if both surveyors were given equal weight, then there's a contest and there is a shortage there. But where one of the surveys should be preferred as supported by other evidence, there is not a survey and as such there should not be the apportionment rule applied here. And the issue that was presented on appeal that was not disputed by the appellee was the only issue was whether the appellant had given sufficient evidence to support that there was a deficiency in the footage. That's the only issue on appeal here. And if there was sufficient evidence to show that there was a deficiency, then there should be the apportionment rule applied. Now, there was no standard review cited in Mr. Lee's brief. And as I recall, Supreme Court Rule 341H3 indicates is that the appellant's brief must state the standard of review as supported by cases. Now, as the appellee's brief showed, that the standard of review should be the manifest weight of the evidence. That would be the appropriate standard. And this would be somewhat of a factual determination by looking if there was sufficient facts presented, sufficient evidence presented, that a West section line legal analysis should be preferred. And because ours was articulated in the appellee's brief, in addition to the cases, I would advocate that the manifest weight of the evidence standard should be applied here. So essentially what this does boil down to is if both of the surveys should be given equal weight. No, they should not be given equal weight because our surveys have, our survey calculates with the other blocks and that there are other survey markers supporting the legal description of Mr. Cox. The boundary markers or survey markers that would support Mr. Parsley's survey are essentially ones that he placed down, one of which placing into right in the driveway of Ms. McWethy. Now, in order for Mr. Cox to go ahead and place those markers, as the appellant indicated he did not, he would have essentially had to go into the garage and started pounding into the garage, which just wouldn't be feasible. This survey was done after the fact. But it was not an isolated survey just looking at that lot. It looked at all the lots, all the blocks surrounding, which is most reasonable to use, again, the West section line starting point analysis. Counsel, when you first started your argument, you made a correction with respect to your brief. Yes, ma'am. I wanted to write that down. Can you repeat that for me? Yes, Your Honor. My correction was on page 2 of my brief. What I had indicated in page 2 was that Mr. Cox had found a already existing survey marker at the northwest corner of lot 2. And it was actually, as shown by his survey and evidence, page 18 at the northwest corner of the east 15 feet of lot 3, which is consistent with the appellee's legal description. Thank you. So adding up the survey markers that are supporting Mr. Cox's survey is essentially four already existing markers. There are none essentially supporting Mr. Parsley's that were already existing that he did not place. The usage of the property had been done according to the West section line legal analysis. So for that reason, the most reasonable interpretation would be using that West section line starting point. There was sufficient evidence for the judge to rule on that, and it was not against the manifest weight of the evidence for the trial judge to find there was sufficient weight to find that there was not a deficiency, at least not from the evidence that was presented. So with that, Your Honor, if there would be no other questions, that would conclude my briefing. Thank you. Thank you. Any argument on rebuttal, Mr. Lee? If I might, Your Honor. It is correct, and I think both of the surveyors noted that they found, and if I remember correctly, I believe the description was an iron pipe. Mr. Parsley noted that in his survey there was an iron pipe, which could not specifically be identified, I don't believe, because there was no kind of marking on it. It was just an iron pipe. I think Mr. Kosick has said, well, that was some sort of a survey marker. No one knows. I don't think Mr. Cox knew. I don't think Mr. Parsley knew who placed the pipe. It did appear from the measurements as though that may have marked the very westernmost corner of the Appalese property, but there was nothing to suggest who had put it there or when it had been placed in the field. I don't know. I just come back to the argument that Your Honor asked. I mean, if you're measuring east or you're measuring west, if property exists on the ground, there shouldn't be a difference. I believe I even asked Mr. Cox about that in the testimony. Why would it matter which way you are measuring from? It shouldn't make a difference. The only thing I can say, which I think I said earlier, is the reason that you have this difference in what the surveyors found is the purpose that they were out there was different. Mr. Parsley was called by my clients to do a boundary survey of their property. When you do a boundary survey, in my experience as a surveyor, the surveyor comes out, he measures from known markers, he then measures up to the property to be surveyed, he surveys around it, he puts corner pins in, and he gives the people a plot. That's what he did here. In doing that, he said, oh, by the way, folks, let me tell you, from things here that I've seen in doing the survey, it appears as though there's a discrepancy in how much property exists because there's an overlap. These folks, their driveway's built over on what I have found to be your property, you know, there is a dispute here. There's a discrepancy. There's a shortage. Mr. Cox came in after the litigation started, measured several different blocks to find various markers to try to prove that the appellee owned the property that she claimed she owned. He didn't put pins in. He didn't mark any of this. My suggestion to the court would be, if Mr. Cox had pinned Mrs. McWethy's property when he did his original survey, there wouldn't have been a dispute at the end as to whether the garage, the new garage, supposedly was on what Mr. Cox said was Mrs. McWethy's property or not. He never put any pins in. So that makes it clear, I think, that the purpose of his survey was completely different than the purpose of Mr. Parsley's survey. There was no litigation involved when Mr. Parsley did the survey. He was simply trying to find the boundary lines. And I think, as I said earlier, in doing that, he was surprised. I mean, you don't naturally expect you're going to find a shortage or an excess. When you go in the field to do a survey, you usually figure it's going to be what it is. Existing markers in these other blocks, as Mr. Kosick said, they're not marked in any way. There's no way to tell when they were placed, who they were placed by. They might happen to be in a specific spot that seems to line up with subdivisions of the property or something, and maybe they were placed by people that did subdivisions of those blocks and lots. The fact of the matter is here, I think, which I think is telling, is it doesn't appear that Mr. Cox ever did his survey all the way on to the east. So how do we know from Mr. Cox's? Well, if you go from the west, everything all lines up. Well, he didn't go check to the east to see why supposedly there was a problem when you were surveying from the east. He just stopped and said, well, you know, according to these existing markers, it looks like everything's okay because Mrs. McWethy would get her 77 feet, and, you know, what difference does it make from there? Well, it makes a difference because, as I've argued, that puts the deficiency on my client, and if it's 8 to 10 feet, that's not de minimis. That's a significant deficiency. So it shouldn't matter whether you measure from the east or the west if everything is okay. And both of the surveyors testified in this case on these properties, everything wasn't okay. Thank you, counsel. We'll take this matter under advisement and be in recess.